5 A.3d 713

**SEVERSTAL SPARROWS POINT, LLC, et al.**

**v.**

**PUBLIC SERVICE COMMISSION OF MARYLAND.**

**No. 418, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Sept. 17, 2010.

602

Todd R. Chason (Michael C. Powell, Gordon, Feinblatt, Rothman, Hoffberger & Hollander LLC of Baltimore, MD and Nancy A. White, Squire, Sanders & Dempsey LLP of Washington, D.C., on the brief), for appellant.

Abigail R. Hopper (Heather H. Polzin, Gen. Counsel, on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., MEREDITH and MATRICCIANI, JJ.

EYLER, DEBORAH S., J.

This appeal challenges orders of the Maryland Public Service Commission ("PSC"), the appellee, capping for three months the electricity supply price for certain small commercial customers and allowing Baltimore Gas and Electric Company ("BGE") to recoup the shortfall caused by the price cap by increasing the electricity distribution rate for large commercial customers. Severstal Sparrows Point, LLC ("Sparrow's Point") and Maryland Energy Group and W.R. Grace & Co. (collectively "MEG"), the appellants, are large commercial customers or associations of large commercial customers whose electricity distribution rates were increased temporarily by the PSC's action. Sparrows Point, for example, incurred during the three-month period approximately $400,000 in charges for electricity distribution over what it otherwise would have paid.

We hold that the PSC's action exceeded its authority and therefore was unlawful.

### FACTS AND PROCEEDINGS

In Maryland, the electricity utility industry is comprised of two primary components: electric energy supply (power), which is a commodity, and electric energy distribution (power lines), which is a service.[1] Historically, these components were "bundled" together and provided to customers exclusively by one utility company in each distribution territory.[2] BGE controlled one such distribution area. Because it operated as a monopoly, BGE's rates for its bundled services were set by the PSC pursuant to Title 4, Subtitle 2 of the Public Utility Companies Article of the Maryland Code. The appropriate rate was determined by

> examining the utility's income and expenses during a test year, calculating the rate base (the fair value of the property used and useful in rendering service) during that year, determining the utility's cost of capital (its required rate of return), and then multiplying that rate of return against the rate base. The result is the amount of income to which the utility is entitled.

*Bldg. Owners and Mngrs. Ass'n v. Pub. Serv. Comm'n,* 93 Md.App. 741, 753, 614 A.2d 1006 (1992) (*"BOMA"*). Depending on whether the net income was significantly higher or lower than the test year income, the PSC was empowered to make increases or decreases to rates. *Id.* Finally, the PSC was authorized to allocate any increase or decrease among the classes of customers. *Id.*

In 1999, the General Assembly enacted the Electric Customer Choice Act ("1999 Act"), codified at Md.Code (2008 Repl.Vol., 2009 Supp.), section 7–501 *et seq.*, of the Public

---

1. A third component, transmission, is not regulated and is not relevant to this case.

2. *In the Matter of Baltimore Gas and Electric Company's Proposal to Implement a Rate Stabilization Plan Pursuant to Section 7–548 of the Public Utility Companies Article and the Commission's Inquiry Into Factors Impacting Wholesale Energy Prices,* Order No. 81423, 2007 WL 1536549, \*18–\*20, 2007 Md. PSC LEXIS 11, \*53–\*55 (May 23, 2007) (*"RSP Order"*), provides a helpful background.

Utility Companies Article ("PUC"), with, among its goals, those of establishing "customer choice of electricity supply" and creating "competitive retail electricity supply and electricity supply services markets."[3] PUC §§ 7–504(1) and (2). To further these goals, the component parts of electric service were to be unbundled. Distribution was to remain monopolized and, therefore, the rates charged were to remain closely regulated by the PSC. Supply was to be deregulated, however, with the rates charged to be largely established by the market. In other words, electricity customers would, for the first time, be permitted to shop on the open market for a third-party electrical energy supplier.

The 1999 Act did not take immediate effect, but was anticipated to be phased in over four years. In the interim, BGE rates were capped at below-market prices as part of a global settlement involving the transfer of BGE's generation assets, the disposition of certain "stranded costs," and other matters. *See RSP Order, supra,* 2007 WL 1536549 at *23, 2007 Md. PSC LEXIS 11 at *68.

Although the 1999 Act permitted consumers to shop for their supply of electricity, its drafters recognized that not all consumers could or would do so. For that reason, the law was written to obligate the electricity utilities such as BGE to continue to provide "backstop" electricity supply, known as Standard Offer Service ("SOS"), to consumers who chose not to shop for their electric supply or, for whatever reason, could not obtain electricity on the open market. The legislative goal was to phase out SOS over time as the competitive market more fully developed in Maryland. While most commercial electricity customers now shop for their energy supply, most residential customers and many small commercial customers do not. They continue to receive SOS electricity supply by default.

---

**3.** Except as stated otherwise, all statutory references in this opinion are to the Public Utility Companies Article.

There are two types of SOS customers, based upon electricity demand. Type I customers are small-usage residential and commercial consumers. Type II customers are larger-usage commercial consumers. For all SOS customers in its distribution area, BGE procures the electricity supply from third parties at periodic wholesale auctions.[4] Because BGE procures electricity supply for Type I and Type II SOS customers at separate auctions, the price charged for electricity supply usually differs between the two classes of customers.

By order effective on June 1, 2008, the PSC changed the definition of "Small Commercial Customers" for purposes of SOS. As a result, some small commercial customers who previously had received SOS as Type I customers became Type II customers.[5] We shall refer to them as "New Type II Customers."

Before then, on April 21, 2008, BGE procured at auction the Type II SOS electricity supply for June 1 through August 31, 2008 ("Summer 2008"), the three-month period immediately following the change in definition of "Small Commercial Customers." On April 24, 2008, the PSC held a hearing to review the auction results. The next day, the PSC confirmed the auction results and allowed BGE to proceed to finalize the contracts for Type II SOS electricity supply for Summer 2008. On May 1, 2008, BGE filed Supplement 414 to its tariff, which included the proposed Type II SOS prices for Summer 2008. BGE's filing showed that, for Summer 2008, the New Type II Customers would incur a price increase of about 40% over what they had paid for electricity supply the previous summer.

On May 16, 2008, the PSC issued a Letter Order ("May 16 Order") explaining that, due to the changed definition of "small commercial customers" and the recently approved results of the Type II SOS auction, New Type II Customers

---

4. One of the changes brought about by the 1999 Act was to prohibit utilities from generating the electrical power they supply. BGE sold its generation facilities to Constellation Energy Group, its parent company.

5. Certain rate classes whose peak demand ranged from 25kW to 60kW were moved from Type I to Type II.

could "see their total bills for the three month period of June through August 2008 increase significantly over the total amounts paid for the same three month period in 2007." It implemented the following action plan to address the upcoming price spike:

> Pursuant to [PUC] § 4–204(a) [ ], and to provide the New Type II Customers a "transition period" to allow them the opportunity to take any necessary steps to mitigate future potential bills [sic] increases, the PSC hereby suspends the portions of the ... BGE Tariff Filing ... that affect the rates of the New Type II Customers. . . .

> Further, the [PSC] directs [BGE] to file substitute tariff pages that would revise the rates that apply to the New Type II Customers such that the total bills for the New Type II Customers will, on average, increase no more than 15% for the period June 1–August 31, 2008 as compared to the same three-month period in 2007 (assuming similar usage by each New Type II Customer). To be clear, the revisions should be reflected in the nondistribution portion of the respective bills. **In addition, [BGE] should propose an adjustment to the distribution charge for nonresidential [sic] for the period June 1, 2008 through August 31, 2008 to collect the estimated costs that will be incurred by [BGE] to reduce the rates of the New Type II Customer as set forth above (the "Estimated Mitigation Costs")**. . . . In the [PSC's] view this one-time transition mechanism is mandated by the public interest in order to avoid an unanticipated price spike and is authorized under [PUC] § 4[-]201 [ ].

(Emphasis added; footnote omitted.) The May 16 Order closed by stating that the PSC would consider BGE's substituted tariff pages at its upcoming May 28, 2008 administrative meeting.

Four days later, on May 20, 2008, MEG filed an omnibus petition to intervene and "motion for reconsideration and for evidentiary hearing."

On May 22, 2008, BGE filed revised tariffs and rates for Summer 2008. Its filing reflected a capped 15% SOS rate

increase for all New Type II Customers. It also included Rider 29, titled "Type II Rate Mitigation and Recovery Charge." That rider provided for a $.00137 per kWh charge to be added to the distribution rate for all non-residential customers [6] to recover what BGE estimated would be $7.4 million in lost revenues due to the three-month SOS price cap for the New Type II Customers.

On May 27, 2008, MEG filed an Opposition to the May 16 Order and Sparrows Point filed a protest. Both parties presented legal arguments as to why the PSC did not have the authority to compensate BGE for the 85% decrease in the supply price to be charged the New Type II Customers during Summer 2008 by increasing the distribution rate for nonresidential customers like themselves. Energy suppliers competing for customers on the open market also filed challenges to the May 16 Order. They argued that, by artificially capping the SOS rates for New Type II Customers below market price, the PSC was improperly inserting itself into the electric utility market.

On May 28, 2008, the PSC held its administrative meeting. The issue of substituted rates for New Type II Customers was item 19 on the agenda. After members of the PSC staff presented their arguments for accepting BGE's mitigation plan for Summer 2008, *i.e.*, the 15% supply price cap for New Type II Customers and the increase in the distribution rate for non-residential customers, representatives of MEG and Sparrows Point, in addition to other groups opposed to the measure, were permitted to make arguments. Formal evidentiary procedures were not followed, however, and the opponents of the rate mitigation plan were not permitted to call witnesses or cross-examine PSC Staff.[7]

---

**6.** The customers affected by the increase were not eligible for SOS service. They had to procure their electricity supply on the open market.

**7.** Although there was no ruling issued on MEG's omnibus petition to intervene and "motion for reconsideration and for evidentiary hear-

At the conclusion of all arguments, the PSC members voted to accept for filing BGE's Supplement 414, as revised. On June 6, 2008, the PSC filed a letter order confirming its decision ("June 6 Order"). It stated, in pertinent part:

The [PSC] finds the mitigation plan consistent with the public good because the plan (a) appropriately mitigates an unanticipated, one-time rate spike that the New Type II Customers otherwise would experience, and (b) imposes an appropriately small additional burden on other customers, and thereby strikes a reasonable balance that serves the public interest. The [PSC] found, after considering objections by the Maryland Energy Group, that it has the authority pursuant to §§ 7–505(b)(8), 4–101, 4–102, 4–201 and 4–204 to set Type II Standard Offer Service rates as filed in the revised tariff pages. Indeed, Maryland courts have long acknowledged the [PSC]'s authority to base rates on the public good "allows the [PSC] to consider and use factors other than pure cost of service. It does not require uniformity and does not require any specific formula or band of reasonableness." [*BOMA*, 93 Md.App. 741, 762, 614 A.2d 1006 (1992)]. The [PSC] finds further that mitigating the New type II [C]ustomers' price spike in this fashion does not violate any provision of the [PUC] Article and that accepting the revised tariff pages for filing, and allowing them to take effect, will result in the same operating income and return to the utilities as their original tariff filings.

Also on June 6, 2008, in the Circuit Court for Baltimore City, MEG petitioned for judicial review of the PSC's decision. On June 24, 2008, Sparrows Point filed its petition for judicial review. The cases were consolidated by order of the circuit court. On April 2, 2009, after briefing and argument, the circuit court affirmed the PSC's ruling.[8]

---

ing," it appears that the request to intervene implicitly was granted and the further requests were implicitly denied.

8. *The circuit court issued an opinion with its order, entitled "Discussion."* It was not served on any of the parties, however, and they only became aware of its existence while preparing for the instant appeal.

In this Court, the appellants present two questions for review, which we have rephrased:

I.  Did the PSC exceed its statutory authority or act arbitrarily by temporarily capping electricity supply rates for New Type II Customers and increasing distribution service rates for all non-residential customers to recoup the shortfall?

II. Was the procedure employed by the PSC prior to issuing the Order inadequate and unlawful?

For the reasons we shall explain, we answer the first question in the affirmative and on that basis reverse the judgment of the circuit court. Our disposition of Question I makes it unnecessary to address Question II.

## STANDARD OF REVIEW

Section 3–203 governs our review of decisions of the PSC: Every final decision, order, or regulation of the [PSC] is prima facie correct and shall be affirmed unless clearly shown to be:

(1) unconstitutional;

(2) outside the statutory authority or jurisdiction of the [PSC];

(3) made on unlawful procedure;

(4) arbitrary or capricious;

(5) affected by other error of law; or

(6) if the subject of review is an order entered in a contested proceeding after a hearing, unsupported by substantial evidence on the record considered as a whole.

In addition, as the Court of Appeals has explained:

[W]hile this Court has made clear that a decision of the [PSC] is subject to judicial review, it will not be disturbed on the basis of a factual question except upon clear and

---

The opinion states that the PSC acted properly to set SOS rates that were "just and reasonable" and that the process employed at the hearing was adequate to address the parties' objections.

satisfactory evidence that it was unlawful and unreasonable. Such a decision is accorded the respect due an informed agency that is aided by a competent and experienced staff. Questions of law, however, are completely subject to review by the courts. This is consistent with the standard of review applicable to administrative agencies generally.

*Town of Easton v. Public Serv. Comm'n,* 379 Md. 21, 31–32, 838 A.2d 1225 (2003) (internal citations and quotations omitted).

The Court of Appeals has recognized, however, that a certain amount of deference is owed to an agency's interpretation of the statute it is empowered to administer. *See People's Counsel v. Public Serv. Comm'n,* 355 Md. 1, 16–17, 733 A.2d 996 (1999) (citing *Baltimore Bldg. & Construction Trades Council v. Barnes,* 290 Md. 9, 427 A.2d 979 (1981)). This is especially so when the agency's interpretation has " 'been applied consistently and for a long period of time' " and when the agency engaged in " 'a process of reasoned elaboration in formulating its interpretation of the statute.' " *Id.* at 17, 733 A.2d 996 (quoting *Baltimore Gas & Elec. Co. v. Public Serv. Comm'n,* 305 Md. 145, 161, 501 A.2d 1307 (1986)).

## DISCUSSION

## I.

### A. Legal Framework

Before turning to the parties' contentions, we first shall review the statutory and regulatory scheme by which the PSC obtains and exercises its authority. Title 2, Subtitle 1 of the PUC Article establishes the structure and general powers of the PSC. Section 2–112(b), titled "Jurisdiction; general powers," states:

(b) *General powers.*—(1) The [PSC] has the powers specifically conferred by law.

(2) The [PSC] has the implied and incidental powers needed or proper to carry out its functions under this article.

Title 4 governs the PSC's ratemaking authority. Section 4–102(a) provides that the PSC "shall have the power to set a just and reasonable rate of a [utility.]" Related Section 4–201 mandates that a utility "shall charge just and reasonable rates" for the services it renders. A "just and reasonable rate" is one that

(1) does not violate any provision of this article;

(2) fully considers and is consistent with the public good; and

(3) . . . will result in an operating income to the [utility] that yields, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return on the fair value of the [utility]'s property used and useful in providing service to the public.

PUC § 4–101.

Section 4–204(a) authorizes the PSC to suspend—without prior proceedings or notice—"any new rate or change in rate proposed by a [utility]." If the PSC exercises its authority under this subsection, it "promptly shall institute proceedings to consider whether the suspended rate is a just and reasonable rate." PUC § 4–204(b).

The 1999 Act added to the PUC Article Title 7, Subtitle 5, captioned, "Electric Industry Restructuring." This subtitle governs SOS and numerous other aspects of the deregulation of the electricity supply in Maryland. The stated purposes of Subtitle 5 are to:

(1) establish customer choice of electricity supply and electricity supply services; (2) create competitive retail electricity supply and electricity supply services markets; (3) deregulate the generation, supply, and pricing of electricity; (4) provide economic benefits for all customer classes; and (5) ensure compliance with federal and State environmental standards.

PUC § 7–504. The general limitation on regulation of electric utilities is set forth in Section 7–509(a). As pertinent here, it provides that, on and after the implementation date of deregulation, "the generation, supply, and sale of electricity, includ-

ing all related facilities and assets, may not be regulated as an electric company service or function except to: (i) establish the price for standard offer service under § 7–510(c) of this subtitle."

The electricity company rendering distribution services in each distribution territory is responsible for providing SOS in that territory. PUC § 7–506(e). Under Section 7–505(b)(8), the PSC "shall determine the terms, conditions, and rates of [SOS] in accordance with: (i) Title 4 of this article; or (ii) as applicable, § 7–510(c)(4) of this subtitle." [9]

Section 7–510, captioned "Phased implementation of customer choice," sets forth the intended schedule for deregulation of the electricity supply. Subsection (c) obligates electricity companies to provide SOS to certain customers, including those not yet eligible to choose a supplier under the phased implementation plan; those unable to obtain a supplier; and those opting to use SOS. As originally codified, the obligation to provide SOS was to cease on July 1, 2003, unless the PSC determined that "no acceptable competitive proposal had been received to supply electricity" to the eligible customers. Ch. 3 of the Acts of 1999, § 1. If the PSC so found, electricity companies would remain obligated to provide SOS to "residential and small commercial customers at a market price that permits recovery of verifiable, prudently incurred costs to procure or produce the electricity plus a reasonable rate of return." PUC § 7–510(c)(3)(ii).[10]

With the passage of Senate Bill 1 ("SB 1"), Chapter 5, 2006 Laws of Maryland, 1st Sp. Session, Section 7–510(c) was

9. As originally enacted, Section 7–505(b)(8) stated that the PSC "shall determine the terms, conditions, and rates of [SOS] in accordance with: (i) Title 4 of this article; or (ii) as applicable, § 7–510(c)**(3)(ii)** of this subtitle." (Emphasis added.) We will discuss this change further, *infra*.

10. In an order dated April 29, 2003, the PSC made such a finding, extending the utilities' obligation to provide SOS. *See In the Matter of the Commission's Inquiry into the Competitive Selection of Electricity Suppliers Standard Offer Service*, Case No. 8908, Order No. 78400, 2003 WL 21051678, *37–38, 2003 Md. PSC LEXIS 5, *137 (April 29, 2003).

amended to provide that electricity companies would continue to be obligated to provide SOS to residential and small commercial customers under the "market price" standard discussed above and that every five years the PSC would report to the Governor and the General Assembly on the status of SOS and the development of the competitive market. SB 1 also added a requirement that SOS supply be procured by a "competitive process" "designed to obtain the best price for residential and small commercial customers in light of market conditions at the time of procurement and the need to protect these customers from excessive price increases." PUC § 7–510(c)(4)(ii).

## B.   Contentions of the Parties

The appellants make several related arguments about the power *vel non* of the PSC to temporarily cap the SOS supply price for the New Type II Customers and then recoup the loss that BGE would incur from the price cap by increasing the distribution rate for large commercial customers. First, they assert that, while with the advent of deregulation in 1999, the PSC retained its wide discretion to set "just and reasonable" rates for *distribution* of electricity, it lost that expansive authority for the *supply* of electricity, including SOS. Therefore, the legal precedents approving allocation of bundled rate increases among classes of customers do not apply and cannot justify increasing the distribution cost for one type of customer (large commercial) in order to pay for the SOS supply cost of another type of customer (New Type II small commercial).

Second, the appellants argue that the power to suspend a new rate or change in rate, under Section 4–204, was not implicated here because the PSC did not suspend BGE's price for electricity for New Type II Customers in Summer 2008. Rather, it allowed the new price to take effect but allocated it partly to the New Type II Customers, by a 15% increase in their SOS price, and partly to large commercial customers, by a temporary increase in their distribution rate. Moreover, the PSC never instituted proceedings in accordance with Section

4–204(b) to determine if the "suspended rate is a just and reasonable rate."

Finally, MEG asserts that the proceedings below were insufficient to protect the due process rights of the parties who, like itself, opposed the mitigation plan. Specifically, the PSC's May 16 Order was issued without any prior proceeding or notice; and thereafter the PSC considered the revised rates submitted by BGE, in keeping with the May 16 Order, as part of a regularly scheduled administrative meeting, without holding an evidentiary hearing.

The PSC responds that it has broad discretion to set "just and reasonable rates" for SOS supply and for electricity distribution service. It maintains that the mitigation plan implemented for Summer 2008 was necessary to protect the New Type II Customers from an unanticipated price spike and was in keeping with the public good. It also argues that allocation of the recapture costs to commercial customers by a temporary increase in their distribution rate was fully in keeping with legal precedent regarding its authority and with the statutory scheme. Finally, with respect to process, it maintains that a customer in the position of the appellants has no right to a quasi-judicial evidentiary hearing; and that, given the brief time frame allotted for approval of SOS tariff rates, it is not possible to provide such a process.

## C. Analysis

■ The central issue in this case is the extent to which the PSC retained authority to regulate the electricity supply after the 1999 Act. The PSC is of the position that, with respect to SOS, its ratemaking authority was largely unchanged in that it retained broad discretion to set just and reasonable rates, including the power to allocate costs among rate classes. For the reasons that follow, we conclude that the PSC's retained authority extends to the oversight of the SOS procurement process but did not allow it to cap SOS rates for New Type II Customers and allocate the recapture costs to other commercial customers.

Our task here is one of statutory construction. As the Court of Appeals recently explained:

The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. *Bd. of Educ. v. Zimmer–Rubert,* 409 Md. 200, 214, 973 A.2d 233, 241 (2009); *In re Najasha B.,* 409 Md. 20, 27, 972 A.2d 845, 849 (2009). A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny. *Anderson v. Council of Unit Owners,* 404 Md. 560, 571, 948 A.2d 11, 18 (2008); *People's Ins. Counsel Div. v. Allstate Ins. Co.,* 408 Md. 336, 351, 969 A.2d 971, 979–80 (2009); *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Dep't of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007); *Gen. Motors Corp. v. Seay,* 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005).

To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. *Zimmer–Rubert,* 409 Md. at 214, 973 A.2d at 241; *Allstate,* 408 Md. at 351, 969 A.2d at 980; *Anderson,* 404 Md. at 571, 948 A.2d at 18; *Allen v. State,* 402 Md. 59, 76, 935 A.2d 421, 431 (2007); *Barbre,* 402 Md. at 172, 935 A.2d at 708; *Kelly,* 397 Md. at 420, 918 A.2d at 482. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. *Zimmer–Rubert,* 409 Md. at 214–15, 973 A.2d at 241–42; *In re Najasha B.,* 409 Md. at 27, 972 A.2d at 849; *Allstate,* 408 Md. at 351, 969 A.2d at 980; *Anderson,* 404 Md. at 572, 948 A.2d at 19; *Barbre,* 402 Md. at 174, 935 A.2d at 708–09; *Kelly,* 397 Md. at 419, 918 A.2d at 482. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application. *Lonaconing Trap Club, Inc. v. Dep't of Env't,* 410 Md. 326, 339, 978 A.2d 702,

709 (2009); *Liverpool,* 369 Md. [304] at 316–17, 799 A.2d [1264] at 1271 (2002); *Curran v. Price,* 334 Md. 149, 172, 638 A.2d 93, 105 (1994); *Amal. Cas. Ins. Co. v. Helms,* 239 Md. 529, 535, 212 A.2d 311, 316 (1965).

We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. *Anderson,* 404 Md. at 572, 948 A.2d at 19; *Drew v. First Guar. Mort. Corp.,* 379 Md. 318, 327, 842 A.2d 1, 6 (2003); *Blondell v. Balt. City Police Dep't,* 341 Md. 680, 691, 672 A.2d 639, 645 (1996); *Comptroller v. John C. Louis Co.,* 285 Md. 527, 538, 404 A.2d 1045, 1052–53 (1979). Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. *Anderson,* 404 Md. at 572, 948 A.2d at 19; *Comptroller v. Phillips,* 384 Md. 583, 591, 865 A.2d 590, 594 (2005); *Harvey,* 389 Md. at 290, 884 A.2d at 1199; *Blondell,* 341 Md. at 691, 672 A.2d at 645. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope. *Harvey,* 389 Md. at 290, 884 A.2d at 1199; *Liverpool,* 369 Md. at 316–17, 799 A.2d at 1271; *Curran,* 334 Md. at 172, 638 A.2d at 104; *John C. Louis Co.,* 285 Md. at 538–39, 404 A.2d at 1053.

*Lockshin v. Semsker,* 412 Md. 257, 274–76, 987 A.2d 18 (2010).

With these principles in mind, we turn to the pertinent provisions of the PUC Article. The PSC argues that the price spike the New Type II Customers would have experienced for SOS in Summer 2008, due to the SOS auction results reflected in BGE's Supplement 414 to its tariff, would not have been consistent with the public good under Section 4–101; therefore, it was authorized to suspend the new price, under Section 4–204, and institute a proceeding to determine a just and reasonable rate. We reject this argument for several reasons.

First, as defined by Section 4–101, a "just and reasonable rate" includes three criteria: 1) the rate does not violate any provision of Title 4; 2) the rate "fully considers and is consistent with the public good"; and 3) the rate "will result in an operating income to the [utility] that yields, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return on the fair value of the [utility]'s property used and useful in providing service to the public." These criteria are phrased in the conjunctive, meaning that all three must be met for a rate to be "just and reasonable." In the instant case, however, the PSC relied only on the first and second criteria, judging the proposed tariff inconsistent with the public good and the mitigation plan consistent with the public good and finding that the revised rates do not violate any provision of the PUC Article.[11]

More important, however, the differences between SOS regulation and traditional ratemaking make plain that the definition codified at Section 4–101 cannot apply in the unique context of SOS. In *Office of People's Counsel, supra,* 355 Md. at 6, 733 A.2d 996, the Court of Appeals considered whether rates set for telephone company services pursuant to "an 'alternative' form of regulation" provided for in the PUC Article also "must meet the 'just and reasonable rates' requirement of the traditional rate of return regulatory scheme." In anticipation of a transition to a competitive, market-based telecommunications system, the General Assembly had amended then Article 78 (now the PUC Article) to allow the PSC greater flexibility in regulating telecommunication rates. Specifically, in 1995 it added Article 78, Section 69(e), which provided, in pertinent part:

> Notwithstanding the provisions of subsection (a) of this section or any other provision of law to the contrary, the

---

11. The PSC stated in its June 6, Order that the new tariff would "result in the same operating income and return to the utilities as their original tariff filings." While this appears to be an attempt to satisfy the third criterion, it is incomplete. As we will *discuss infra,* it is apparent that the third criterion could not be applied in this case.

[PSC] may regulate a telephone company by means of alternative forms of regulation ... if it finds, after notice and hearing that the alternative form of regulation protects consumers by, at a minimum, *producing affordable and reasonably priced basic local exchange service....*

(Emphasis added.) At that time, Art. 78, Section 69(a) set forth the definition of a "just and reasonable rate" that now appears without substantive modification at Section 4–101 of the PUC.

Pursuant to this statutory change, the PSC issued an order adopting a price cap regulatory plan for telecommunication rates. People's Counsel appealed the PSC's order, arguing, in part, that a finding that the plan produced "affordable and reasonably priced" rates was not equivalent to a finding that the rates were just and reasonable. The PSC responded that Art. 78, Section 69(e) obviated the requirement that it set a "just and reasonable rate," instead requiring that it set a rate that met the standard in that section.

The Court of Appeals held that, when the PSC was using an "alternative form of regulation" as contemplated by Art. 78, Section 69(e), it was not bound by the definition of "just and reasonable rate" in Art. 78, Section 69(a). The Court reasoned that the definition of a "just and reasonable rate" required, as it still does, "a traditional rate analysis to be made from a specified comparison of costs, rates and profits to determine just and reasonable rates." 355 Md. at 23, 733 A.2d 996. Those criteria could not apply outside the traditional ratemaking process. The Court concluded, however, that the overarching requirement that the PSC set, and public utilities charge, just and reasonable rates remained applicable, even when an alternative form of regulation was employed. It decided that, in enacting Art. 78, Section 69(e), the legislature had intended a "just and reasonable rate," in the context of alternative forms of regulation, to mean a rate "producing affordable and reasonably priced basic local exchange service," not to mean a "just and reasonable rate" as defined in Art. 78, Section 69(a). *Id.* at 24, 733 A.2d 996. The PSC was free to further define the phrase "producing affordable and reason-

ably priced basic local exchange service" and to apply it to the price cap regulatory scheme permitted by Art. 78, Section 69(e). *Id.*

■ Returning to the instant case, we similarly conclude that the definition of a "just and reasonable rate" in Section 4–101 of the PUC cannot apply in the context of SOS because its relevance lies outside the realm of traditional rate-of-return ratemaking. We explain.

As discussed, *supra,* in a traditional electricity ratemaking case, the PSC would analyze the electricity utility's income and expenses for a "test year" and then would calculate the test year's rate base, *i.e.,* "the fair value of the company's property used and useful" in rendering the service.[12] *Public Serv. Comm'n v. Balto. Gas & Elect Co.,* 273 Md. 357, 363, 329 A.2d 691 (1974); *see also* PUC § 4–206(a) (defining rate base). Only after the rate base was valued could the PSC determine the utility's reasonable rate of return, *i.e.,* "a return which will result in as much net operating income as will yield a reasonable return on the rate base fixed." *Public Serv. Comm'n, supra,* 273 Md. at 363, 329 A.2d 691. The rate of return would be multiplied against the rate base to produce the income to which the utility was entitled. *BOMA, supra,* 93 Md.App. at 753, 614 A.2d 1006. If this income differed significantly from income for the test year, the PSC would authorize an increase or decrease to the utility's rates. *Id.*

Once the increase or decrease in rates was authorized, the PSC then could allocate the change among the rate classes. *See id.* ("The last phase of [the ratemaking] process is to allocate any increase or decrease among the various classes of customers, for only then can the actual rates necessary to produce the approved level of income be calculated.") The

---

12. The rate base either was calculated as of the last day of the test year (terminal rate base) or averaged over the entire twelve months of the test year (average rate base). Various factors affected which calculation was more accurate, including the pace of the utility company's growth and inflation. *Public Serv. Comm'n, supra,* 273 Md. at 364, 329 A.2d 691.

various rate classes—*i.e.*, residential, commercial, industrial—did not pay the same rate per kWh for their electricity. In determining whether price differentials among classes were "just and reasonable," the PSC would rely on two standards: cost of service and value of service. *Id.* at 754, 614 A.2d 1006 (citing C. Phillips, *The Regulation of Public Utilities*, ch. 10 (1988)). Cost of service was based on "the acknowledged fact that it is more expensive to serve some customers than to serve others." *Id.* Thus, to the extent that the differential in cost could be calculated, price differentials were justified. The value of service standard, on the other hand, was based on differences in demand among the classes of customers. It focused on need for the service, ability to pay for the service, and the availability of alternatives. It was acknowledged to produce discriminatory pricing. *Id.*

Although the PSC never explicitly adopted the cost of service method of setting prices, it did actively seek to narrow the differentials between classes by comparing the rate of return for each rate class to the average system-wide rate of return and determining a "zone of reasonableness." *Id.* at 755, 614 A.2d 1006. The zone was a "band that straddle[d] the systemwide rate of return." *Id.* The PSC attempted to "nudge the various class rates of return close to or within that band." *Id.* The rate of return for residential rate classes fell below the systemwide average, while the rate of return for commercial and industrial customers was higher than the average. As such, the PSC tried to allocate rate increases and decreases so as to move both groups closer to the average, without entirely eliminating price differentials.[13]

---

13. In traditional ratemaking cases, there were extensive evidentiary hearings. *See, e.g., Publ. Serv. Comm'n, supra,* 273 Md. at 359, 329 A.2d 691 (3000 pages of testimony and numerous exhibits submitted); *BOMA, supra,* 93 Md.App. at 746, 614 A.2d 1006 ("extensive hearings" held prior to PSC order); *In the matter of BGE,* 75 Md.P.S.C. 171, *3 (May 29, 1984) (nine evidentiary hearings and six evening hearings for public comment held before PSC order entered). In addition to the utility and PSC staff, various industry groups and People's Counsel typically intervened and also presented evidence.

The PSC does not dispute that its role in regulating SOS prices is markedly different from its role in traditional ratemaking. In its brief, the PSC contrasts its role in the instant case with its role in a traditional ratemaking case as follows: [14]

> [T]he issues before the [PSC] in this matter are far less involved than those presented in a full rate case.... The tariff[ ] [BGE] filed t[ook] the results of the April 2008 SOS auction and translate[d] them into rates that permit [BGE] to recover the cost of purchasing the power for the different SOS loads. The [PSC] [did] not need to establish the reasonableness of the costs (it already has done so by establishing and supervising the auction process), the extent to which BGE is entitled to recover those costs (because it is entitled to recover them in full), or a resulting rate of return. The only issue [was] how to distribute those costs across the different customer classes, and the [PSC] need[ed] only [to] devise a procedure that allow[ed] it to vet and answer that question.

Thus, in the instant case, the PSC grafted the final phase of a traditional ratemaking case—allocation—on to the much more abbreviated SOS oversight process. The mismatch between these processes is readily apparent. In a traditional ratemaking case, the utility's permissible rate of return, its allowed income by extension, and the distribution of that income via rate schedules were determined in a comprehensive proceeding in which all interested parties appeared and presented evidence. In the instant case, the April 21, 2008 auction results determined the cost of the electricity supply for each subset of SOS customers and, in approving the auction results, the PSC found that BGE was entitled to recover the entirety of that cost. The appellants were not involved in the auction approval phase of this process because they were not entitled to participate in SOS and, thus, had no interest in the auction results.

---

14. This excerpt from the PSC's brief was intended to support its argument that the procedures utilized in the instant case were sufficient to protect the appellants' due process rights.

Moreover, the PSC identified no operative standard beyond the nebulous "consistent with the public good" benchmark in exercising its purported authority to allocate part of the SOS *supply price*, as determined by the auction results, to non-residential customers' *distribution rate*. In its June 6 Order approving the mitigation plan, the PSC quoted from this Court's decision in *BOMA*:

> Maryland courts have long acknowledged the [PSC's] authority to base rates on the public good "allows the [PSC] to consider and use factors other than pure cost of service. It does not require uniformity and does not require any specific formula or band of reasonableness." [*BOMA*, 93 Md. App. 741, 762, 614 A.2d 1006 (1992).]

Yet, this excerpt reveals a central flaw in any analogy between the allocation the PSC effected here and the allocation permitted in a traditional ratemaking case. In *BOMA*, as in all traditional ratemaking cases, the allocation was guided, generally, by the cost of service standard. The systemwide rate of return was the starting point for the PSC's analysis of how to achieve a just and reasonable allocation of the shared costs of supplying and distributing the electric supply. Here the costs being allocated already accounted for the cost of service because the supply was procured in an auction limited to the Type II load. The appellants were not being asked to pay a larger share of the cost of a common service. Rather, they were being asked to subsidize the cost of service to another class of customers for a service they were not eligible to receive. Thus, the SOS costs were not being "allocated" among members of a customer base but were being shifted from one customer base to another, unrelated customer base.

It is clear from the above discussion that, as in *People's Counsel, supra*, we must look elsewhere in the statute to determine the standard guiding the PSC's regulatory authority in the context of SOS. Of course, in *People's Counsel*, the telecommunications industry remained fully monopolized, and the Court of Appeals assumed that the PSC retained authority to regulate its rates. In the instant case, that presumption may not be justified.

Pursuant to PUC Section 7–509(a), "[o]n and after the initial implementation date [of deregulation of the electricity supply], the generation, supply, and sale of electricity . . . may not be regulated as an electric company service or function *except to* [ ] *establish the price for standard offer service under § 7–510(c) of this subtitle* [.]." (Emphasis added.) Section 7–505, captioned "Transition to a restructured electric industry," further provides that the PSC "shall determine the terms, conditions, and rates of standard offer service in accordance with: (i) Title 4 of this article; or (ii) as applicable, § 7–510(c)(4) of this subtitle." PUC § 7–505(b)(8).

Section 7–510(c) provides, in pertinent part, that electricity companies, including BGE, are obligated to provide SOS to residential and small commercial customers "at a market price that permits recovery of the verifiable, prudently incurred costs to procure or produce the electricity plus a reasonable return." PUC § 7–510(c)(3)(ii). Moreover, it empowers the PSC, "by regulation or order[ ] and in a manner that is designed to obtain the best price for residential and small commercial customers in light of market conditions at the time of procurement and the need to protect these customers from excessive price increases," to require the electricity companies, including BGE, to employ certain procurement procedures outlined in the section.[15] PUC § 7–510(c)(4)(ii).

The PSC maintains that, because Section 7–505(b)(8) references Title 4, it is meant to bring SOS under the umbrella of traditional "just and reasonable" ratemaking. This reading of the statutory language is untenable. Section 7–505(b)(8) is phrased in the disjunctive. Thus, it must be read to mean that *either* Title 4 *or,* "as applicable," Section 7–510(c)(4) governs the "terms, conditions, and rates" for SOS. A review

---

15. The various alternatives presented are designed to give the PSC flexibility in managing the procurement process in terms of when the auctions occur; the amount of load bid out at any one time; and, at times, to allow utilities to purchase SOS supply via a bilateral contract outside of the competitive process if it deems that to be in the interest of the SOS customers.

of the history of this section and Section 7–510 makes clear why both options were included.

As discussed above, when Title 7, Subtitle 5 was added to the PUC Article, in 1999, the obligation to provide SOS was meant to cease on July 1, 2003, absent a finding by the PSC that the electricity supply market had not fully developed to provide service to residential and small commercial customers. *See* Ch. 3, 1999 Laws of Maryland. As enacted, Section 7–505(b)(8) provided that SOS rates would be determined pursuant to Title 4 or, "as applicable," Section 7–510(c)(3)(ii)—the subsection governing SOS—if, and only if, it were to continue beyond July 1, 2003. Thus, Section 7–510(c)(3)(ii) only could be "applicable" if the PSC made a finding that SOS should continue beyond that date. Prior to that date, under the plain language of the statute, only Title 4 could apply. Had the legislature intended both Title 4 *and* Section 7–510(c)(3)(ii) to apply simultaneously, however, it could have stated that the PSC shall determine the terms, rates and conditions of SOS pursuant to Title 4 *and,* as applicable, Section 7–510(c)(3)(ii). It did not do so. The only sensible reading of the plain language of Section 7–505(b)(8) is that Title 4 governed the PSC's regulatory authority over SOS rates prior to July 1, 2003, and Section 7–510(c)(3)(ii) governed after that date.

As originally enacted, Section 7–510(c)(3)(ii) stated that, if the SOS obligation were continued, it would have to be provided "at a market price that permits recovery of the verifiable, prudently incurred costs to procure or produce the electricity, plus a reasonable return." Thus, after July 1, 2003, this standard became operative. In 2006, when the legislature enacted SB 1, Section 7–510(c)(3) was modified to state that the electricity companies had a continuing obligation to provide SOS to residential and small commercial customers under the same standard from the prior version. As discussed, *supra,* SB 1 also added a provision that, as part of the obligation to provide SOS under Section 7–510(c)(3), the PSC should require electric companies to obtain the SOS supply through a "competitive process" "designed to obtain the best price . . . in light of market conditions at the time of procure-

ment and the need to protect these customers from excessive price increases." PUC § 7–510(c)(4)(ii). Finally, Section 7–505(b)(8) was amended to cross-reference this new subsection, which internally cross-referenced Section 7–510(c)(3)(ii).

In this context, we construe Section 7–505(b)(8) to mean that, before July 1, 2003, the PSC retained its Title 4 powers with respect to SOS and, after that date, its powers to regulate SOS were limited to those set forth in Section 7–510. This reading is consistent with Section 7–509's dictate that the electricity supply could not be regulated except to "establish the price for [SOS] *under § 7–510(c) of this subtitle.*" (Emphasis added.) No reference to traditional Title 4 powers appears in this section. It follows that the scope of the PSC's authority to regulate SOS is confined to the standards set forth in Section 7–510(c): 1) that the price is a "market price that permits recovery of the verifiable, prudently incurred costs to procure or produce the electricity plus a reasonable return" and 2) that it was procured "in a manner that is designed to obtain the best price for residential and small commercial customers in light of market conditions at the time of procurement and the need to protect these customers from excessive price increases."

We find further support for our conclusion in a PSC order issued shortly before the orders at issue in the instant case. In 2007, the PSC conducted extensive evidentiary proceedings to determine its options for responding to an impending price spike for residential SOS customers. The below-market rate caps on BGE SOS incident to the 1999 Act originally were set to expire on July 1, 2004. Pursuant to settlements reached by the PSC, the caps were extended another two years, until July 1, 2006. As a result of market conditions during the six year freeze on rates, when the rates were to return to market price on July 1, 2006, residential SOS customers were facing a 72% rate increase.

It was in response to the public outcry over this price spike that the General Assembly enacted SB 1, which capped the residential SOS rates at 15% of the increase for another year (until July 1, 2007) and permitted the PSC to implement a

voluntary Rate Stabilization Plan ("RSP") for an additional six months to allow customers who opted-in to defer some of the increase. SB 1 expressly provided, however, that residential SOS prices be "at market" by January 1, 2008 and that BGE be permitted to recoup any monies deferred by the mandatory rate cap and a voluntary RSP in the years that followed by adding surcharges onto residential customers' bills.

As a result of SB 1, residential SOS rates were set to return to market rates as of July 1, 2007, absent action by the PSC to implement an opt-in RSP for another year. The market rate amounted to a total annual increase of 50%.[16] BGE proposed an opt-in RSP to be effective from July 1, 2007 through December 31, 2007. The PSC conducted eight days of hearings, heard testimony, and cross-examined 23 witnesses before reaching the conclusion that 1) the BGE residential SOS rates set to take effect were in compliance with the law; 2) a slightly modified version of the RSP should be adopted; and 3) it was without legal authority to cap the rates.

With respect to the propriety of the SOS rates themselves, the PSC identified the standard to be applied as "whether BGE's residential SOS rates are at a market price that permits recovery of the verifiable, prudently incurred costs to procure or produce the electricity commodity plus a reasonable return." *RSP Order, supra,* 2007 WL 1536549 at *10, 2007 Md. PSC LEXIS 11 at *29 (citing PUC § 7–510(c)(3)(ii)). In light of SB 1's amendment of PUC Section 7–510, the PSC also viewed its role as ensuring that the SOS procurement process "will obtain the best price in light of market conditions at the time of procurement, and also prevent large rate increases." *Id.* at *19, 2007 Md. PSC LEXIS 11 at *54 (summarizing PUC § 7–510(c)(4)(ii)). Citing to Section 7–505(b)(8),[17] the PSC concluded that if SOS procurements com-

---

**16.** Subsequent residential SOS procurements had lessened the amount of the increase.

**17.** In the *RSP Order,* the PSC erroneously cited to the non-existent Section 7–508(b)(8) in support of its conclusion, but clearly intended to cite to Section 7–505(b)(8).

plied with applicable statutory standards and regulations, the resulting rates would be "just and reasonable [ ] in the absence of other factors which could impact the integrity of the results of the procurements." *Id.* at *19, 2007 Md. PSC LEXIS 11 at *54–*55.

Applying these principles, the PSC concluded that BGE's proposed residential rates were procured in compliance with the applicable statutory and regulatory regime and that, accordingly, there was no legal basis to invalidate them. *Id.* at *33–*34, 2007 Md. PSC LEXIS 11 at *101. There was no discussion in the *RSP Order* of suspending the rate increase and allocating it to other classes of SOS customers or to non-SOS customers via distribution rate increases as in the case at bar. Thus, in the *RSP Order*, the PSC viewed its role in regulating SOS rates to be confined to regulating and overseeing the procurement process, *i.e.,* the wholesale auctions, to ensure it was sufficiently competitive to produce a market price that, in light of market conditions, was fair. If the process was fair and met with the PSC's approval, the resulting rates would be *de facto* "just and reasonable" according to the PSC's own interpretation of the statutory scheme.

■ Finally, we consider the PSC's contention, raised for the first time on appeal, that Section 2–112(b)(2) authorizes its actions generally, including the action it took in this case, when there otherwise is no precedent or established practice justifying it. That section provides that the PSC has the "implied and incidental powers needed or proper to carry out its functions" under this article. We agree with the appellants that it would be contrary to the spirit of statutory interpretation to read such a "gap-filling" provision as granting powers otherwise not granted in the PUC Article.

Accordingly, for the reasons already discussed, we conclude that, by enacting the 1999 Act, as modified by SB 1, the General Assembly limited the PSC's role in regulating the electricity supply, including SOS, in Maryland. In the instant case, the PSC, after approving the results of the April 21, 2008 auction, was without the authority to cap the SOS price for the

New Type II Customers that resulted from that auction and shift a portion of that SOS price to large commercial customers by increasing their distribution rate.

JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO VACATE THE PSC'S LETTER ORDERS OF MAY 16, 2008, AND JUNE 6, 2008, AND TO REMAND THE MATTER TO THE PSC FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.